# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, <br><br>         Plaintiff, <br><br> v. <br><br> THE UNIVERSITY OF TEXAS AT AUSTIN; JIM DAVIS, in his official capacity as President of the University of Texas at Austin; CHRISTINA MELTON CRAIN, JODIE LEE JILES, KELCY L. WARREN, KEVIN P. ELTIFE, NOLAN PEREZ, STUART W. STEDMAN, JANIECE LONGORIA, JAMES C. "RAD" WEAVER, AND ROBERT P. GAUNTT, all in their official capacities as members of the University of Texas System Board of Regents; JAMES B. MILLIKEN, in his official capacity as the Chancellor of the University of Texas System; TIA C. MADKINS, in her official capacity as Assistant Professor, Department of Curriculum and Instruction at the University of Texas at Austin; YASMIYN IRIZARRY, in her official capacity as Associate Professor of African and African Diaspora Studies at the University of Texas at Austin. <br><br>         Defendants. | **COMPLAINT** <br><br> Civil Action No. 1:25-cv-596 |

Plaintiff, American Alliance for Equal Rights, brings this action against Defendants for violating the Fourteenth Amendment of the U.S. Constitution, Title VI, and 42 U.S.C. §1981. The Alliance seeks declaratory relief, injunctive relief, and nominal damages.

# INTRODUCTION

1.      "Racial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). It "demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* (cleaned up).

2.      The Fourteenth Amendment's "'core purpose'" was "'doing away with all governmentally imposed discrimination based on race.'" *Id.* at 206 (cleaned up). Congress has also forbidden racial discrimination by recipients of federal funds, *see* 42 U.S.C. §2000d, *et seq.*, and in contracting, §1981.

3.      Yet Defendants operate—using millions of dollars in taxpayer-funded National Science Foundation grants—an explicitly race-based project designed "to foster racial equity in STEM for all Black people." *Award Abstract # 2140904: Examining Blackness in Postsecondary STEM Education through a Multidimensional-Multiplicative Lens*, NSF, perma.cc/ZG7F-WLBN (archived Apr. 6, 2025) (*Black epiSTEMologies UT Austin*). The project, styled "Black epiSTEMologies," seeks to "explore" students' "conceptions of Blackness … as it relates to their STEM engagement and perspectives of racial equity in STEM," with the goal of "inform[ing] the development and implementation of racial equity focused policies and practices in STEM education." *Id.*

4.      The project's primary research method is a contract: Black students with STEM backgrounds from around the State are invited to complete a short survey and sit for a sixty-minute focus group interview in exchange for a $40 gift card. Non-black students, regardless of STEM background, are excluded.



5.      Defendants' exclusion of non-black STEM students flouts the Equal Protection Clause and Title VI. And because they refuse to contract with non-black students, Defendants' actions also violate Section 1981.

6.      "Eliminating racial discrimination means eliminating all of it." *Harvard*, 600 U.S. at 206. And "all of it" includes research projects that distribute federal funds to certain racial groups for the purpose of advancing "racial equity" in higher education. The Alliance is entitled to relief.

## JURISDICTION AND VENUE

7. This action arises under the Fourteenth Amendment to the U.S. Constitution and the laws of the United States. The Alliance proceeds under Title VI and 42 U.S.C. §1981, §1983, and §1988. The Court has subject-matter jurisdiction under 28 U.S.C. §1331 and §1343.

8. Venue is proper under 28 U.S.C. §1391 because a substantial part of the events giving rise to the Alliance's claims occurred in the Western District of Texas on the main campus of the University of Texas at Austin.

## PARTIES

9. The American Alliance for Equal Rights is a nationwide membership organization that is dedicated to ending racial classifications and racial preferences in America.

10. The Alliance was founded in 2021. It was approved by the IRS as a 501(c)(3) tax-exempt organization the same year.

11. The Alliance has more than 280 members, and its membership continues to grow. The Alliance's members are actively involved in the organization and its affairs. Members voluntarily join the Alliance. They pay dues. They receive updates. And they offer input on the Alliance's litigation and other activities. The Alliance represents them in good faith.

12. The Alliance has at least one member, including Member A, who is ready and able to complete Defendants' survey and sit for Defendants' focus group. Member A attempted to complete the survey and sign up for the focus group but was excluded because he is not black. Lacking the resources or expertise to do so himself, Member A has authorized the Alliance to vindicate his rights in this suit. The Alliance represents him in good faith.

13.     Defendant University of Texas at Austin is a public university organized and existing under the laws of Texas.

14.     Defendant Jim Davis is the Interim President of the University of Texas at Austin. As Interim President, Davis is responsible for the enactment and enforcement of university policies and the administration of university programs, including the challenged program. Davis is sued in his official capacity.

15.     Defendants Christina Melton Crain, Jodie Lee Jiles, Kelcy L. Warren, Kevin P. Eltife, Nolan Perez, Stuart W. Stedman, Janiece Longoria, James C. "Rad" Weaver, and Robert P. Gauntt are the nine members of the Board of Regents, the governing body of the University of Texas System. The Regent Defendants are responsible for the adoption and authorization of policies that govern students at the University and for the administration of university programs, including the challenged program. The Regent Defendants are sued in their official capacity.

16.     Defendant James B. Milliken is the Chancellor of the University of Texas System. As Chancellor, Milliken is the chief executive officer of the University of Texas System and is responsible for instituting the policies and procedures of the Board of Regents. Milliken is responsible for all aspects of the University of Texas System's operations, including oversight and implementation of the challenged program. Milliken is sued in his official capacity.

17.     Defendant Tia C. Madkins is an Assistant Professor in the Department of Curriculum and Instruction at the University of Texas at Austin. Madkins' research focuses on "supporting educators to understand and implement equity-focused teaching practices to transform PK-20 STEM learning environments for minoritized learners, especially Black girls

and women." *Black EpiSTEMologies: Leadership Team*, perma.cc/S5LP-R8A3 (archived Apr. 6, 2025). Madkins is a member of the Black EpiSTEMologies "Leadership Team" and is listed as the Principal Investigator on the NSF grant funding the challenged program at UT Austin. *See id.*; *Black EpiSTEMologies UT Austin*.

18.    Defendant Yasmiyn Irizarry is an Associate Professor of African and African Diaspora Studies at the University of Texas at Austin. Irizarry's research "focuses on racial identity and measurement, racialized contexts in education, and minoritized students' STEM experiences and trajectories." *Black EpiSTEMologies: Leadership Team*. Irizarry is a member of the Black EpiSTEMologies "Leadership Team" and is listed as the Co-Principal Investigator on the NSF grant funding the challenged program at UT Austin. *See id.*; *Black EpiSTEMologies UT Austin*.

# FACTS

## I.    The Black epiSTEMologies Project

19.    "Black epiSTEMologies is a multi-institutional collaborative research project," that aims to "promot[e] racial equity for All Black people by advancing research that disrupts anti-Black norms, values, beliefs, and practices in STEM." *Black epiSTEMologies*, perma.cc/8NRA-BRQ8 (archived Apr. 6, 2025).

20.    The project's core concern is that university STEM programs "run the risk of not appropriately benefiting all Black people due to … assumptions about Black racial identities and the types of structural engagement needed to advance holistic, racial well-being in transformative and sustainable ways." *Black EpiSTEMologies UT Austin*.

21.    According to Defendants Madkins and Irizarry, two members of the project's leadership team, "STEM contexts do not adequately support Black undergraduate STEM students because STEM educators and practitioners remain unsure of what Blackness means for individuals, thereby constraining true racial equity endeavors." *Id.*

22.    The project seeks to address this perceived deficit in STEM's race-consciousness by "explor[ing] how self-identifying Black undergraduates perceive, understand, and embody Blackness within STEM fields," "account[ing] for Blackness through a multidimensional-multiplicative lens" and employing "mosaic ethnography" across five participating college and universities. *Black epiSTEMologies: Research and Scope*, perma.cc/F98P-NJ2Y (archived Apr. 6, 2025). The end goal is to "influence racial equity-focused STEM policies and practices" and "enhanc[e] the access, success, and engagement of Black undergraduates in STEM." *Id.*

23.    Black epiSTEMologies, including the Texas-based component that Defendants administer, is funded by the federal government through the National Science Foundation. *Black epiSTEMologies* ("A new $8.8 million, five-year National Science Foundation research project."). NSF funds Black epiSTEMologies by awarding millions in federal research dollars to Defendants and their counterparts around the country. *See, e.g.*, *Black epiSTEMologies UT Austin.* The project is ongoing and is expected to continue until at least late 2027. *See, e.g.*, *id.* (listing an estimated end date of August 31, 2027).

## II.    Black epiSTEMologies at UT Austin.

24.    Defendants Madkins and Irizarry secured federal funding to house a Black epiSTEMologies team at UT Austin and are responsible for administering the project's operations throughout Texas. *See id.*; *Black epiSTEMologies: Institutions—UT Austin*, perma.cc/4735-HFFV

(archived Apr. 6, 2025) (explaining that the Black epiSTEMologies team at UT Austin operates "under the direction of" Madkins and Irizarry).

25.     Under Madkins's and Irizarry's direction, and with the remaining Defendants' blessing, UT Austin's Black epiSTEMologies team has made a concerted effort to solicit participation from black undergraduates with STEM backgrounds attending Texas universities.





26.    The UT Austin Black epiSTEMologies team solicits participants through a simple offer: Qualifying students agree to complete the Black epiSTEMologies eligibility survey and to participate in a subsequent hour-long focus group interview. In exchange, Defendants agree to provide students with a $40 gift card.

27.    To qualify, a student must be over the age of eighteen, attend a Texas college or university, "[b]e an undergraduate in STEM," and "[i]dentify as Black."

28.    Defendants' survey refines these eligibility criteria. *See Black EpiSTEMologies UT Austin: Survey*, bit.ly/4jdNusA (last visited Apr. 6, 2025). To "[i]dentify as Black" means to "identify racially as Black or as a mixed race, biracial, or multiracial person with at least one Black parent." *Id.* A student qualifies as "an undergraduate in STEM" if he or she has either "declared or intends to major in a core or interdisciplinary STEM field" or "completed at least one required course (and all prerequisite courses) toward a minor, certificate, or concentration in a core STEM field and intends to work in a STEM job or career after graduation." *Id.*

## III.  Defendants' administration of the Black epiSTEMologies project at UT Austin injures the Alliance's members.

29.    The Alliance has at least one member, including Member A, who has been and continues to be harmed by Defendants' administration of the project.

30.     Member A is full-time undergraduate student at a Texas university and is over eighteen years of age. He has declared a double major in two core STEM fields and plans to pursue a career in a STEM field after he graduates in 2027. Member A is white.

31.     Member A is ready and able to complete Defendants' survey and to participate in the subsequent focus group interview. As detailed above, Member A satisfies all of Defendants' race-neutral eligibility criteria. He is over eighteen, is a full-time student at a Texas university, and is double majoring in core STEM fields and plans to pursue a career in STEM after graduation. Member A enjoys discussing his experiences at college and wants to offer Defendants his perspective as a Texas STEM student who plans to pursue a STEM career after college.

32.     Member A is willing to participate in UT Austin's Black epiSTEMologies survey and focus group on the terms that Defendants have publicly offered on social media. In fact, he accessed Defendants' survey and attempted to complete it on April 2, 2025.

33.     Before Member A could proceed past the first page of Defendants' survey, he had to answer the following question: "Do you identify racially as Black or as a mixed race, biracial, or multiracial person with at least one Black parent?" The question had three options:

34.     "Yes, I identify racially as Black."

35.     "Yes, I identify as a mixed race, biracial, or multiracial person *and* I have at least one Black parent."

36.     "No, neither of these applies to me."

37.     Because Member A is white with no black parent, he selected the third answer. After completing the first page, Member A attempted to click through to the next page of the

survey. But the survey abruptly ended, and Member A was presented with the following message:

> Thank you for taking the time to complete this survey.
>
> Based on your responses, you do not meet the qualifications to participate in our study.

38.     Member A sincerely desires to complete Defendants' survey and participate in Defendants' focus group in exchange for the promised $40 gift card. He will continue to meet all of Defendants' race-neutral criteria until he graduates in 2027, as he has no plans to transfer schools outside of Texas, change his major or career goals to pursue a non-STEM career, or take any other action that would disqualify him from participating. And though Defendants have already excluded him because of his race, Member A would immediately move to reapply if a court ordered Defendants to stop discriminating.

39.     Member A is disappointed and disturbed that Defendants excluded him from the project simply because he is not black. Member A has no control over his race, and the fact that he is white has no bearing on his ability to offer insights based on his experience as a Texas STEM student pursuing a STEM career. Member A was also looking forward to receiving the $40 gift card that Defendants promised, which he would have used to buy engineering-related supplies.

40.     Member A is pseudonymous because he does not want Defendants to hold his involvement in this lawsuit against him in the future. He also does not want to face reprisal from his classmates, his college, his professors, future employers, or the public for joining the Alliance and opposing race-based programs in higher education.

# COUNT I
# Violation of the Fourteenth Amendment
# (Against Davis, Milliken, the Regent Defendants,
# Madkins, and Irizarry)
# (42 U.S.C. §1983)

41.     Plaintiff repeats and realleges each of its prior allegations.

42.     Section 1983 provides that "[e]very person who, under color of any statute, or-dinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983.

43.     Davis, Milliken, Madkins, Irizarry, and the Regents Defendants are all "per-son[s]" acting under the color of state law. *Id.*

44.     The Fourteenth Amendment provides, among other things, that no person shall be denied "the equal protection of the laws." U.S. Const. amend. XIV, §1.

45.     The "central mandate" of equal protection is "racial neutrality" by the govern-ment. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). And the "'core purpose' of the Equal Protec-tion Clause" is to "'d[o] away with *all* governmentally imposed discrimination based on race.'" *Harvard*, 600 U.S. at 206 (emphasis added). "[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand*, 515 U.S. at 229-30; *see also Muldrow v. St. Louis*, 601 U.S. 346, 365 (2024) (Kavanaugh, J., concurring in the judgment) (explaining that unlawful discrimination is itself a harm).

46.    Defendants' Black epiSTEMologies project is expressly designed to benefit members of a certain race. And the project's primary research methods, the survey and focus group that Member A was excluded from participating in, employ an explicit racial classification and determine students' eligibility based on race.

47.    When the government "distributes … benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

48.    "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. The Supreme Court has "insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications." *Johnson v. California*, 543 U.S. 499, 505 (2005). Strict scrutiny is required because "[r]acial classifications raise special fears that they are motivated by an invidious purpose." *Id.* "'Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining … what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Id.* (cleaned up).

49.    Strict scrutiny is a "searching examination, and it is the government that bears the burden to prove 'that the reasons for any racial classification are clearly identified and unquestionably legitimate.'" *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (cleaned up). The racial classification "must survive a daunting two-step examination." *Harvard*, 600 U.S. at 206. First, the racial classification must "'further compelling governmental interests.'" *Id.* at 207. Second, the government's use of race must be "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Id.*

50.    Defendants cannot satisfy strict scrutiny.

51.    Defendants cannot show a compelling governmental interest for excluding non-black STEM students from the project. The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *Id.* There is no evidence that Defendants are administering the project to remedy some past discrimination in which they participated. Instead, Defendants want to compensate black STEM students for participating in the program and for helping them gather information that will, in turn, support the implementation of yet more racially discriminatory policies in higher education. Such an outright race-based distribution of state resources and federal funds—especially in the educational context—is patently illegitimate and illegal. *See Brown v. Bd. of Educ.*, 347 U.S. 483, 493-94 (1954); *Harvard*, 600 U.S. at 216-18.

52.    The program is also not narrowly tailored.

53.    Defendants cannot show that excluding all non-black STEM students is necessary to achieve any of their interests.

54.    Non-black STEM students' race operates as a "negative" by categorically excluding them from participating in the program. *Harvard*, 600 U.S. at 219.

55.    Defendants use race as a stereotype—for example, by proceeding from the assumption that only black STEM students will have meaningful information to offer or experiences to share regarding how to best ensure that university STEM programs serve their students.

56.    Defendants' use of race has no end date. Indeed, the goal of the project is to develop additional race-based interventions in STEM education to address Defendants' perception that the field does not adequately support black students with targeted "racial equity" programming.

## COUNT II
## Violation of 42 U.S.C. §1981
## (Against Davis, Milliken, the Regent Defendants, Madkins, Irizarry, and UT Austin)

57.    Plaintiff repeats and realleges each of its prior allegations.

58.    Defendants' solicitations for its Black epiSTEMologies project exclude individuals, including Member A, from forming a contractual relationship because of race. *AAER v. Founders First*, 2024 WL 3625684, at *3 (N.D. Tex. July 31). Under §1981, "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts." 42 U.S.C. §1981(a). That law bans contract discrimination by state actors. *Founders First*, 2024 WL 3625684, at *3. It protects all races. *Id.* And it covers contracts like this one. *Id.* In sum, Defendants have violated §1981 "because [the] program is a contract that discriminates." *Id.*

59.    To begin with, §1981 covers actors like Defendants. "Section 1981 covers contracts between government, nongovernmental, and private parties." *Id.* (quoting *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 762 (5th Cir. 1986)). It "'provides a cause of action'" for "'public … discrimination.'" *Id.* (cleaned up). And it authorizes "'equitable and legal relief'" when state actors like Defendants discriminate "'based on race.'" *Id.* (quoting *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975)).

60.     Member A falls within §1981's ambit, whose "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 298 (1976). Titled "Equal rights under the law," §1981 promises "continuous equality between white and nonwhite citizens." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019). The law secures that promise by protecting the "equal right of *all* persons" to "make and enforce contracts without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up and emphasis added). So §1981 applies regardless of "whether the aggrieved party is black or white." *Founders First*, 2024 WL 3625684, at *3 (quoting *Bobo v. ITT, Cont'l Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981)).

61.     Defendants' Black epiSTEMologies program, which compensates Texas STEM students for completing a survey and participating in a focus group, is a contract under §1981. "The term contract, as used in §1981, refers to a right in the promisee against the promisor, with a correlative special duty in the promisor to the promisee of rendering the performance promised." *Id.* at *3 n.7 (quoting *Adams v. McDougal*, 695 F.2d 104, 108 (5th Cir. 1983)). The challenged program, a classic exchange of goods and services, fits that definition: Defendants receive student input for their surveys and focus groups, while students receive $40 gift cards on completion of their participation.

62.     Alternatively, the completion of Defendants' survey can be understood as a prerequisite to contracting with Defendants to participate in the focus group in exchange for a $40 gift card, which also violates §1981. "[A] contractual relationship need not already exist" to trigger §1981 because the law protects "would-be contractor[s] along with those who already have made contracts." *Domino's Pizza*, 546 U.S. at 476. So state actors are liable "under

§1981 when, for racially motivated reasons, they prevented individuals who 'sought to enter into contractual relationships' from doing so." *Id.* (quoting *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)).

63.    Either way, Defendants' program implicates a right that §1981 protects—the right to "make … contracts." 42 U.S.C. §1981(a).

64.    Defendants are intentionally discriminating. "[P]roof of a facially discriminatory … policy"—or even "a corporate decision maker's express[ed] desire to avoid" contracting with members of a certain race—is "direct evidence of discriminatory intent." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). Here there's both. The program "facially discriminat[es]" against all non-black students. *Id.* And Black epiSTEMologies at UT Austin's "decision maker[s]" (Madkins and Irizarry, with the remaining Defendants' blessing) have expressed a "desire to avoid" contracting with non-black students. *Id.* Indeed, the publicly available information describing the program (including the abstract of Defendants' NSF grant), makes clear that Black epiSTEMologies is intended to benefit only black students. The Alliance, therefore, "is not required to make any further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

## COUNT III
## Violation of Title VI
## (42 U.S.C. §2000d, *et seq.*)
## (Against UT)

65.    Plaintiff repeats and realleges each of its prior allegations.

66.    Defendant UT is violating Title VI by taking money from the federal government while discriminating against white STEM students. Title VI instructs that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. UT Austin "receive[s] federal financial assistance" and has "intentionally discriminated" against Member A. *Easley v. Univ. of Tex. at Arlington*, 984 F. Supp. 2d 631, 635 (N.D. Tex. 2013); *accord Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

67.    The Alliance can sue under Title VI. "[I]t is beyond dispute that private individuals may sue to enforce" Title VI. *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 218 (2022) (cleaned up). And when they sue, private parties can seek nominal damages and equitable relief. *Id.* at 221; *accord Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001) ("[A] plaintiff who has proven a civil rights violation" under §1981 and Title VI "is entitled as a matter of law to an award of nominal damages."); *AAER v. Southwest Airlines*, 2024 WL 5012055 (N.D. Tex. Dec. 6) (holding that the Alliance has standing to seek nominal damages in a similar case).

68.    UT Austin is intentionally "discriminat[ing]." *See* 42 U.S.C. §2000d; *accord Sandoval*, 532 U.S. at 280. Intentional discrimination is unlawful whenever it fails strict scrutiny. *Harvard*, 600 U.S. at 198 n.2. As explained above, UT Austin's Black epiSTEMologies program cannot satisfy strict scrutiny: UT Austin cannot rely on either of the "two compelling interests" that might justify racial classifications, and its outright ban on non-black STEM students is not "narrowly tailored." *Id.* at 207.

69.    The challenged program is also a "program or activity" that receives "financial assistance." 42 U.S.C. §2000d. Here, the "program or activity" inquiry begins and ends with the fact that UT Austin received an NSF research grant for more than $1.5 million to fund its Black epiSTEMologies team. *See Black epiSTEMologies UT Austin*.

# PRAYER FOR RELIEF

The Alliance respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.  A declaratory judgment that Defendants' administration of the Black epiSTEMologies program at UT Austin violates the Fourteenth Amendment, Title VI, and 42 U.S.C. §1981.

B.  A permanent injunction requiring Defendants to administer the program, including any offers to contract with students to complete surveys or focus groups, without regard to race.

C.  A permanent injunction requiring Defendants to undo the effects of their discrimination, including by reopening application processes, redoing surveys and focus groups, and other similar relief.

D.  Nominal damages of $1 against Defendant UT.

E.  Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

F.  All other relief that the Alliance is entitled to.

Respectfully submitted,

Dated: April 21, 2025

_/s/ Cameron T. Norris_
Thomas R. McCarthy*
  (VA Bar No. 47154)
Cameron T. Norris
  (TN Bar No. 33467)
James F. Hasson*
  (TX Bar No. 24109982)
Zachary P. Grouev*
  (FL Bar No. 1038629)
R. Gabriel Anderson*
  (TX Bar No. 24129302)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com
tom@consovoymccarthy.com
gabe@consovoymccarthy.com
zach@consovoymccarthy.com

*pro hac vice application forthcoming

_Counsel for Plaintiff American Alliance for Equal Rights_